UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-10747-RGS

COMMONWEALTH DIAGNOSTICS INTERNATIONAL INC.

v.

NEWTEK SMALL BUSINESS FINANCE LLC

MEMORANDUM AND ORDER
ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

March 8, 2023

STEARNS, D.J.

Commonwealth Diagnostics International, Inc. (CDI), a clinical diagnostics and health technology startup company, brought this suit against its lender, Newtek Small Business Finance, LLC (Newtek), under common-law theories of fraudulent inducement and recission and for violation of Mass. Gen. Laws ch. 93A prohibiting unfair and deceptive acts. CDI alleges that Newtek, in providing a $5 million loan, misrepresented that the Small Business Administration (SBA) required collateral largely exceeding the loan amount and overcollateralized the loan. CDI also alleges that the COVID-19 pandemic rendered performance of its loan agreement with Newtek

1

impossible. CDI now moves for a preliminary injunction to prevent Newtek from liquidating CDI's collateral for a period of at least six months.

## BACKGROUND

CDI's main business is the manufacture and analysis of diagnostic tests for gastrointestinal illnesses. CDI formed in 2015 and began operating in 2017. In mid-2017, seeking financing to reintroduce several products its principals, Brian Strasnick and Craig Strasnick, had previously developed, CDI sought a $5 million loan from Newtek, an SBA-approved lender. The loan closed in September of 2017.

Newtek required over $9 million in collateral for the loan to CDI, including a Raymond James Collateralized Securities Account (holding approximately $2 million), mortgages on real estate owned by CDI's affiliate Common Ground Enterprises, LLC (worth about $2 million), and mortgages on Brian Strasnick's primary residence and Craig Strasnick's secondary residence (in combination, worth over $5 million). Second Am. Compl. [Dkt # 42] ¶ 39. Newtek also required personal guaranties from Brian, Craig, and Bonnie (Brian's wife) Strasnick and from CDI's affiliates and entities controlled by the Strasnicks. *Id.* ¶ 40. CDI took issue with the amount of collateral needed but agreed to the terms of the loan agreement because

Newtek told CDI that the amount of collateral had been determined by SBA guidelines. *Id.* ¶¶ 44-45.

In early 2018, CDI was not as profitable as it had hoped it would be. Consequently, it sought to liquidate some of the property listed as collateral to stay current on its loan payments. *Id.* ¶¶ 51-52. CDI claims that Newtek required payment of $500,000 from the sale in exchange for release of the collateral. *Id.* ¶¶ 53-54. In 2018, CDI began missing loan payments. *Id.* ¶¶ 57-58; *see also* Opp. Mot. for Prelim. Inj. [Dkt # 12] ¶¶ 6-7 (noting that Newtek sent two past due loan letters to CDI by August 31, 2018 and permitted CDI to modify its loan three times).

In March of 2020, the COVID-19 pandemic impacted CDI's income. The number of diagnostic tests it processed decreased significantly; CDI's overhead increased because materials became more expensive and personnel costs rose; insurance carriers — which remit payment for CDI's analysis of the diagnostic test kits — took longer than they had before the pandemic; and CDI also delayed collection on patient payments, wrote off certain tests, and offered hardship-based patient payment plans. CDI was unable to service the loan under the circumstances.

In February of 2022, Newtek declared a default on CDI's loan and exercised its rights to accelerate the Note, requiring about $4 million

immediately. In May of 2022, Newtek announced that it would begin liquidating CDI's collateral. *Id.* ¶ 68.

This court stayed this proceeding in June of 2022 pending the Massachusetts Supreme Judicial Court's (SJC) decision in *Le Fort Enterprises, Inc. v. Lantern 18, LLC*, 491 Mass. 144 (Jan. 3, 2023), which concerned a similar claim to CDI's. *See* 6/14/2022 Order [Dkt # 14]. The parties were ordered not to take any action in derogation of the status quo until the preliminary injunction motion was resolved. *Id.*

On February 28, 2023, plaintiffs alerted the court that Brian Strasnick intended to sell his personal residence, which had been pledged as collateral to secure the loan. CDI proposed that the sale be permitted to go forward and the proceeds be placed into an escrow account pending the outcome of this litigation. *See* Emergency Mot. for Clarification [Dkt # 44] ¶¶ 3-6.

## DISCUSSION

Courts consider the following when determining whether to award a preliminary injunction: "(1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995); *Ryan v. U.S. Immig. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). "Likelihood of success is the main bearing wall of the four-

4

factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996); *see also CVS Pharmacy, Inc. v. Lavin*, 2020 WL 966544, at *3 (1st Cir. Feb. 28, 2020) (Likelihood of success on the merits is the factor that "weighs most heavily in the preliminary injunction analysis."); *Ryan*, 974 F.3d at 20 ("If the movant 'cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'"), quoting *New Comm Wireless Servs. Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

The court will address CDI's likelihood of success on the merits. CDI makes three arguments.

First, CDI argues that the COVID-19 pandemic rendered performance of the loan agreement impracticable. However, considering the SJC's decision in *Le Fort*, the court is unconvinced that CDI is likely to prevail under this theory.

As the SJC explained, a plaintiff must establish three elements to establish a claim of impracticability:

> First, a supervening, extreme event caused the party's performance to be impracticable. . . . Second "the nonoccurrence of the event was a basic assumption on which the contract was made," and the occurrence of the event was not a risk that the parties were tacitly assigning to the promisor by their failure to provide for it explicitly . . . . Third, "the impracticability resulted without the fault of the party seeking to be excused."

5

*Le Fort* at 153-154 (citations omitted).

In *Le Fort*, the SJC found the "absence of a causal link [between the pandemic and the co-obligers' inability to perform] fatal to the co-obliger's claim of impracticability." *Id.* at 155.  Here, CDI could met its obligations under the loan agreement.  Because the loan was collateralized by an amount at least equal to the loan itself, CDI could perform its obligations under the loan agreement with Newtek by liquidating its collateral.  Its claim of impracticability thus is likely to fail.[1]  *See id.* at 156 ("The contract promised repayment -- not repayment from franchise revenue specifically -- and even if payment from the franchise revenue was made impracticable by the pandemic, the promise to repay was not.").  Additionally, CDI was unable to make its monthly loan payments as early as 2018, which undermines CDI's claim that the COVID-19 pandemic caused its inability to meet its loan obligations.

Second, CDI argues that Newtek failed to perfect its security interest in Brian Strasnick's Raymond James Security Account.  But the plain language of the Raymond James agreement CDI cites makes it clear that Newtek's

---

[1] Plaintiffs' argument that selling Brian Strasnick's collateralized personal residence in Swampscott for $2.6 million would not be in derogation of the status quo in part because the sale could "maximize the value of the asset and the liquidity will only facilitate any eventual transfer," Emergency Mot. for Clarification ¶ 9, drives this point home.

6

security interest was perfected by that very document. *See* Raymond James Pledge Agreement [Dkt # 42-2] at 2 ("[Newtek] and [Brian Strasnick] have entered into a security agreement dated September 20, 2017 . . . pursuant to which [Brian Strasnick] has granted to [Newtek] a first priority security interest in a securities account maintained by [Raymond James] for [Brian Strasnick]. **The parties are entering into this Agreement to perfect the Lender's security interest in that account.**") (emphasis added). Furthermore, the UCC states that a party may perfect its security interest in a deposit account through control of the collateral. Mass. Gen. Laws ch. 106, § 9-314(a) ("A security interest in investment property, deposit accounts, letter-of-credit rights, electronic chattel paper or electronic documents may be perfected by control of the collateral under Sections 9–104, 9–105, 9–106, 9–107 or 7–106."); *id*. § 9-104(a) ("A secured party has control of a deposit account if: . . . the debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the account without further consent by the debtor."). That is precisely what the Raymond James Pledge Agreement accomplished. Section I of the agreement, titled "Control by Lender," states, "[Raymond James] will comply with all notifications it receives directing it to transfer or redeem any property in the account . . .

7

originated by [Newtek] without further consent by [Brian Strasnick]." Raymond James Pledge Agreement at 2.

Finally, CDI is unlikely to prevail on its third claim of fraudulent inducement. "To establish a fraudulent inducement claim, the [party] must show '(1) that the statement was knowingly false; (2) that [the defendant] made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision to sign the contract; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance.'" *Armstrong v. White Winston Select Asset Funds*, LLC, 2022 WL 17981392, at *8 (D. Mass. Dec. 27, 2022), quoting *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003).

CDI cannot establish Newtek's statement that the collateral it requested met SBA guidelines was likely false, let alone knowingly false. CDI points to the following language to argue that SBA guidelines did not require collateralization to the extent that Newtek requested: "For loans in excess of $350,000, SBA requires that the lender collateralize the loan to the maximum extent possible *up to the loan amount*." SBA SOP 50 10 5 (F), subpart B, chapter 4, II, "Collateral," January 1, 2014, page 165 (emphasis added). But this requirement must be read in conjunction with all the SBA

8

guidelines, including the other sentences in the same subsection. Immediately following the sentence CDI cites is the following: "If business fixed assets do not 'fully secure' the loan in accordance with Paragraph 1. above, the lender . . . **must** take available equity in the personal real estate (residential and investment) of the principals as collateral." *Id.* (emphasis in original). Paragraph 1 states that a loan is considered fully secured "if the lender has taken security interests in all available fixed assets," where "'fixed assets' means real estate, including land and structures, machinery and equipment owned by the business or an [eligible passive company]." *Id.* at 164.

As far as the court can tell from CDI's Complaint, and the parties do not suggest otherwise, the value of CDI's fixed assets in which Newtek took a security interest was less than the loan amount of $5 million. *See* Amended Compl. [Dkt # 42] ¶ 39 (stating Newtek took over $9 million in collateral for the loan but listing $7 million worth of collateral in the name of the principals). Under the SBA guidelines, CDI's loan was not fully secured and Newtek was permitted to take the Strasnicks' real estate as collateral. Moreover, CDI has not established that Newtek *knew* its interpretation was incorrect. CDI thus cannot establish the first element for fraudulent inducement.

9

Because CDI cannot establish likelihood of success, the court need not evaluate the remaining factors of the preliminary injunction test. *See Nasar Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 37 (1st Cir. 2008) ("Since [the plaintiff] has no probability of success on the merits of its claim, we need not address the other factors in the preliminary injunction determination.").

## ORDER

For the foregoing reasons, CDI's Motion for a Preliminary Injunction is <u>DENIED</u>.  In issuing this order, CDI's Motion for Clarification becomes moot.  The Clerk will cancel the scheduled hearing on the matter.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE